UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ALLISON COVINGTON,

        Plaintiff,

    v.

KEN JOHNSON, CHAD ROBERTS, and
CITY OF MURPHYSBORO, ILLINOIS,

        Defendants.

Case No. 18-cv-1076-JPG-GCS

## MEMORANDUM AND ORDER

This matter comes before the Court on the motions for summary judgment filed by

defendants City of Murphysboro, Illinois ("City") (Doc. 39), Chad Roberts (Doc. 40), and Ken

Johnson (Doc. 41). Plaintiff Allison Covington has responded to the respective motions (Docs.

44, 45 & 46).

## I.     Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels*

*Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The court must construe the evidence in the

light most favorable to the nonmoving party and draw all reasonable inferences in favor of that

party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520

F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the

Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*,

712 F.3d 1166, 1168 (7th Cir. 2013). Where the non-moving party carries the burden of proof

at trial, the moving party may satisfy its burden of production in one of two ways. It may present evidence that affirmatively negates an essential element of the non-moving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the non-moving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

## II.    Facts

Construing the evidence and drawing all reasonable inferences in Covington's favor, the evidence establishes the following relevant facts.

Covington is a woman and suffers from attention deficit and hyperactivity disorder ("ADHD"), a condition for which she takes medication. She was diagnosed in 2012 who noted she had mild cognitive impairment. At that point, Covington had difficulty concentrating,

thinking, and focusing, and those difficulties manifested themselves in her behavior. She began taking medication to control her symptoms and has continued through the present. On medication, she no longer has difficulty concentrating and no longer displays the symptoms she had been suffering before her diagnosis.

On October 22, 2016, Covington began working as a probationary dispatcher—a telecommunicator, as the City calls it—for the Murphysboro Police Department ("MPD"). Defendant Roberts, a man, was the chief of police at that time. Defendant Johnson, a man, was the main telecommunicator assigned to train Covington. Telecommunicators Ashley Etherton and Katie Ehlers, both women, also trained Covington. Telecommunicator training was not a very formal process. There was no written training policy or protocol; generally, the trainers helped each trainee on an individual basis to teach them what they needed. The recommended training period for telecommunicator was eight weeks followed by a test, but the informal training process extended beyond that time.

When Covington reported to work on her first day, she found a large picture of herself posted on the bulletin board. When she asked Johnson about it, he said that he had printed it from Covington's Facebook page and that he wanted to post it so all the police officers in the MPD could see "the cute dispatcher" that would be working with them. He also told her he was the reason she was hired and that he had recommended her because she looked better than the other applicant. Covington felt uncomfortable that he was showing her picture to other officers and took the photograph off the bulletin board. Covington spent the first week of her training observing other telecommunicators.

Thereafter, Johnson's behavior toward Covington turned extremely unprofessional. In the first week of November 2016, Johnson commented to Covington that he could tell she wore

thong underwear because he could not see underwear lines through her pants and that his wife did not wear thong underwear but he wished she would. Covington began wearing leggings underneath her pants so Johnson would not be able to tell what kind of underwear she was wearing. Around that time, Johnson also raised his shirt to show her his nipple rings. On another occasion he commented to Covington that he did not like the fabric of the underwear his wife wore. Around Christmas, Johnson searched for lingerie for his wife on the computer at work and asked whether Covington would wear certain items and whether her husband would like them. He also told Covington he would make his wife shower before having oral sex, and asked Covington if and how often she had oral sex with her husband. Covington was unable to remember any other specific, discrete instance of sexual harassment, although, except for about the second half of November when Covington was away at training or Johnson was on vacation, he talked about his wife and underwear a lot. It was common knowledge around the MPD, including by three sergeants and Roberts, that Johnson behaved inappropriately toward Covington, yet nothing was done about it.

In addition to Johnson's sexual comments, shortly after she started the job, he began verbally abusing her almost every time he was with her by making fun of her, calling her belittling names like "idiot," "retarded," and "stupid," and sometimes making her cry. In addition, he would tell her to figure things out on her own.

Johnson also seemed to want to intimidate Covington. He told her numerous times that his father was a judge in Jackson County, the county in which Murphysboro is located. Roberts also told Covington once about Johnson's father. Johnson told Covington he controlled whether she was retained as an employee. Covington was afraid of losing her job, so she tried to get along with Johnson, although she found his behavior offensive. In fact, Covington and Johnson

4

exchanged friendly text messages when he was on vacation in mid-November.

On December 3, 2016, Johnson saw Covington with her ADHD medicine and began calling her belittling names.   Covington told Johnson that she had ADHD, and he responded that he could not train someone with ADHD.   Indeed, after that, rather than training and communicating with Covington, Johnson instead smoked, kicked his feet up, played video games, and told her to figure things out for herself.

Later in December, Covington reported Johnson twice to higher officers.   She told MPD Lt. Mike Laughland about Johnson's underwear talk and the belittling names he called her and about her ADHD.   Laughland told her to "[j]ust kind of deal with it" because "that's just the way [Johnson] is."   Covington Dep. 229:2-6 (Doc. 44-5).

Around December 17, 2016, Covington also told MPD Sgt. Smelter about Johnson's sexual harassment and name-calling and her own ADHD.   That discussion led to a meeting with Laughland and Roberts where she told them about Johnson's behavior, including his refusal to train her, and her ADHD.   On December 21, 2016, they moved Covington to a later shift so she would not have to work in the hostile environment created by Johnson, under whose tutelage she had not made sufficient progress, but would instead train with Etherton, Ehlers, and Amelia Crain.   After the move, Johnson turned petty, throwing out Covington's lunch and hiding her belongings.   On one occasion Covington had to train under Johnson because of scheduling problems, and again he refused to look at or speak to her.

Covington's training period was extended beyond the recommended eight weeks.   Not surprisingly given Johnson's training methods, not all of Covington's training under Johnson had been completely effective, but she was making progress.   In fact, now that Johnson was no longer responsible for training her, Covington was advancing well under Ehlers.   There were

some areas in which she needed improvement, but others in which she was able to complete the task with minimal assistance, comprehended and understood the task, or was able to complete the task without assistance.

Johnson was not the only MPD employee who made Covington uncomfortable. On October 31, 2016, after a training drill away from the MPD station, Roberts drove Covington back to the station, and on the way he drove by his house saying he wanted to show her where he lived. He stopped the car in the driveway and told Covington about the inside of the house and that his wife had not yet been able to move there with him so he would be living alone for a while. The conversation made her uncomfortable because it could have been interpreted as suggesting they have a sexual encounter in the home while his wife was away.

On another occasion, Covington fielded a call from a suicidal caller who called the MPD often. After Covington spoke with him for an extended period of time, Roberts told Covington the caller might stop calling if she "would stop having f***ing phone sex with him." Additionally, Roberts refused to schedule CPR training for Covington, which prevented her from receiving a raise.

Out of Covington's presence, Roberts and Johnson did some other questionable things. Roberts mimicked tickling his private parts to describe how his daughter was being taught to perform a swimming stroke, and Johnson told another female trainee she should wear lingerie for her first day at work and called her belittling names.

Covington was scheduled to test on the Illinois police database system on January 17, 2017, but she was terminated before she could take the test. Despite never having received any complaints about her work and having received moderately positive job reviews with suggestions for improvement, Murphysboro Mayor Will Stevens terminated Covington's employment on

January 17, 2017, at Laughland's and Roberts's recommendation. They cited negative marks in her reviews, her use of sick leave, and her difficulty remembering training when returning after several days off. Covington had not received the verbal warning, written warning, and suspension required by the collective bargaining agreement that governed her employment. Although Ehlers had earlier expressed some doubts about whether Covington would be able to do the job of telecommunicator, she was surprised by Covington's termination and thought she had not been given a legitimate chance to succeed. Sgt. Smelter thought she should have been given an opportunity to work longer with a telecommunicator other than Johnson.

Covington points to the treatment of two other female telecommuters who were not terminated. Crain, a female telecommunicator trainee, was recommended for termination but was not fired. Another female telecommunicator, Heather Foley, was recommended for termination but was not fired. Foley had cashed a check from the City of Murphysboro that she had been asked to return, had used the MPD computers to obtain facts about a friend under investigation, had consumed alcohol on the job and then drove a squad car, and had fought with Etherton.

On July 11, 2017, Covington filed a charge with the Equal Employment Opportunity Commission and the Illinois Department of Human Rights asserting sex discrimination, disability discrimination, and retaliation. She received a right to sue letter on February 12, 2018, and filed this lawsuit on May 7, 2018. In this suit she alleges the following claims:

**Count I:**     claims against the City under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, for sex discrimination, hostile work environment, and retaliation;

**Count II:**     claims against the City under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, for disability discrimination, hostile work environment, and retaliation;

| **Count III:** | claims against Johnson, Roberts, and the City under 42 U.S.C. § 1983 for violation of her Fourteenth Amendment Equal Protection rights through purposeful discrimination on the basis of gender and disability; |
|---|---|
| **Count IV:** | claims against Johnson, Roberts, and the City under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.*, for disability discrimination and retaliation; and |
| **Count V:** | claims against Johnson, Roberts, and the City under the IHRA for sexual harassment and retaliation. |

## III. City's Motion for Summary Judgment (Doc. 39)

The City asks the Court to grant summary judgment for it on all counts. The Court addresses each in turn.

### A. Disability Discrimination Claims: Counts II and IV

The City seeks summary judgment on Covington's disability claims in Counts II and IV because she has insufficient evidence to prove she was actually disabled or regarded as disabled. Covington responds correctly that the City relies on law that predates the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), which became effective in January 2009. The ADAAA substantially broadened the definition of disability from the standards courts had applied up to that time and rejected the precedents upon which the City's argument is based, namely, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), *Toyota Motor Mfg, Ky., Inc. v. Williams*, 534 U.S. 184 (2002), and their progeny. *See* 29 C.F.R. Pt. 1630, app. (Interpretive Guidance on Title I of the ADA; "The express purposes of the ADAAA are, among other things . . . [t]o reject the requirement enunciated in Sutton and its companion cases. . . ; [and t]o reject the standards enunciated by the Supreme Court in Toyota. . . .").

The ADA provides, in pertinent part, that an employer shall not "discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement or

discharge of employees, employee . . . job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Similarly, the IHRA prohibits discrimination on the basis of physical or mental disability. 775 ILCS 5/1-102(A) & 775 ILCS 5/2-102(A).[1]

To prove an ADA claim for disparate treatment in violation of 42 U.S.C. § 12112(a) and (b)(1), a plaintiff must show that she is disabled. *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016). The ADA defines "disability" as (a) a physical or mental impairment that substantially limits one or more major life activity of an individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(1). Major life activities include concentrating and thinking. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1603.2(i)(1)(i). An impairment counts as a disability under the ADA if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication." 42 U.S.C. § 12102(4)(E)(i)(I).

Courts should construe this definition of disability "in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A); *see* 29 C.F.R. § 1603.2(j)(1). Indeed, the ADAAA aimed "to make it easier for people with disabilities to obtain protection under the ADA," and to shift the focus of ADA litigation to "whether covered entities have complied with their obligations and whether

[1] Both parties assume the ADA's definition of "disability" is also the IHRA's, a proposition the Court accepts in the absence of any argument to the contrary.

9

discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4); *see* 29 C.F.R. Pt. 1630 app. (Interpretive Guidance on Title I of the ADA).

Covington claims she is disabled because she has an actual impairment and because she was regarded as having an impairment. The Court addresses each theory in turn.

### 1. Actual Impairment

The City argues that Covington has no evidence to show she was actually disabled *at the time of her employment* with the City. It notes that an ADHD diagnosis by itself is not sufficient to prove a disability because the Court must consider how the diagnosed problem actually affected the plaintiff. Here, the City argues, Covington has no evidence of how her ADHD impaired her ability to perform a major life activity because she has been on corrective medication since 2012 when she was first diagnosed, including the period of time in which she worked for the MPD. In essence, the City suggests Covington must have stopped taking her medication and put herself at the full mercy of her medical condition before she could prove her condition was disabling.

This is a preposterous suggestion. Would the City also argue that a person with asthma must stop taking her inhaler and risk a life-threatening attack before she can prove asthma substantially affects the major life activity of breathing? Or that a person with epilepsy must stop taking her medication and have a seizure to prove her epilepsy still impairs her neurological functioning? The Court firmly rejects this position. Instead, it finds that, in light of the ADAAA 2008 instructions regarding the broad interpretation of "disability," the evidence of Covington's 2012 symptoms and ADHD diagnosis, along with evidence that she has been prescribed medication continuously since that time, could lead a reasonable jury to find her ADHD substantially limited her ability to perform the major life activities of concentrating and

thinking during her employment with the MPD.

## 2. Regarded as Having Such Impairment

The City also argues that Covington has no evidence to show she was regarding as having a substantially limiting impairment. Covington argues that after the ADAAA, she need only show that her employer believed she had an impairment, not that the employer believed her impairment substantially limited a major life activity.

This prong of the definition of disability is designed to cover individuals suffering from adverse employment action because of "the myths, fears and stereotypes associated with disabilities." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001) (internal quotations omitted); *see* 29 C.F.R. pt. 1630 app. (noting Congress's intent in the ADA to prohibit discrimination based on "unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities"). Prior to the ADAAA, a plaintiff had to show that the employer believed the plaintiff's impairment, real or imagined, was substantially limiting. *Serednyj v. Beverly Healthcare, LLC,* 656 F.3d 540, 556 (7th Cir. 2011), *abrogated on other grounds by Young v. United Parcel Serv.*, 135 S. Ct. 1338 (2015). The ADAAA changed that standard. *See id.* at 552 n.2. Now, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added).

The City argues that Murphysboro Mayor Stevens, the official who made the final decision to fire Covington, was unaware that Covington had ADHD so could not possibly have regarded her as impaired or limited by an impairment. It also argues that Covington cannot

11

show Roberts, who recommended her dismissal to Stevens, or Laughland, who wrote the memorandum upon which Roberts based this recommendation, regarded her as impaired, although they knew she had ADHD. In other words, while Roberts and Laughland, arguably the "cat's paws" that caused Stevens to terminate Covington, knew of her ADHD, there is no evidence they believed it substantially impaired her.

Again, the City ignores the changes wrought by the ADAAA. After 2009, it does not matter whether the City or its decisionmakers thought that ADHD substantially limited Covington; it is enough that they knew she had ADHD, a well-recognized impairment, *see Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998) ("There is no dispute that ADD qualifies as an impairment for purposes of the statute."). Covington testified she told Roberts and Laughland about her ADHD, and a reasonable jury could find her testimony true. Roberts's and Laughland's estimation of the degree of impairment of Covington's ADHD is not relevant to whether they regarded her as disabled.

Furthermore, it is clear that Johnson regarded Covington as not only having an impairment but having one that substantially limited her ability to think and concentrate; that is the precise reason he gave for refusing to provide the same training that was provided to other telecommunicator trainees.

For these reasons, the City is not entitled to summary judgment on Counts II and IV on the grounds Covington cannot prove she disabled.

B.       Sex Discrimination Claims:   Counts I and V

The City seeks summary judgment on Covington's sexual harassment hostile environment claims in Counts I and V because she has insufficient evidence to prove her work environment was objectively hostile. Covington points to the frequency of the harassing

incidents to argue that together they amounted to an objectively hostile working environment.

Title VII prohibits employment discrimination on the basis of sex: "It shall be an unlawful employment practice for an employer. . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). This sex discrimination prohibition includes the prohibition of sexual harassment that creates a hostile work environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

A Title VII hostile work environment claim can be brought to remedy conduct that has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor*, 477 U.S. at 65. To prevail in a sexual harassment claim, a plaintiff must prove "(1) her work environment was objectively and subjectively offensive, (2) the harassment she complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018); *accord Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012). At issue in this motion is the third element—the severity or pervasiveness of the offensive conduct.

Sexual harassment that creates a hostile work environment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor*, 477 U.S. at 67) (further internal quotations omitted); *see also*; *Burlington Indus. v. Ellerth*, 524 U.S. 742, 752 (1998); *Passananti*, 689 F.3d at 667.

"[H]arassing conduct does not need to be both severe and pervasive. One instance of conduct that is sufficiently severe may be enough." *Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (internal citations omitted). Additionally, "[t]he employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Cooke v. Stefani Mgmt. Servs.*, 250 F.3d 564, 566-67 (7th Cir. 2001) (citing *Harris*, 510 U.S. at 21-22).

Determining what is sufficient to constitute an objectively hostile working environment is not an easy task. The Court must examine the totality of the circumstances and "should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1045 (7th Cir. 2000). The environment must be judged by "'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-88 (quoting *Harris*, 510 U.S. at 23) (further internal quotations omitted); *accord Passananti*, 689 F.3d at 667. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotations and citations omitted); *accord Passananti*, 689 F.3d at 667.

Generally, inappropriate physical touching is considered more severe than mere verbal behavior, but in this case there was no touching. Nevertheless, purely oral harassment, when pervasive, can amount to actionable harassment. *See Passananti*, 689 F.3d at 669 (repeated and demeaning use of the word "bitch" paired with false accusations of misconduct; collecting other examples of actionable orally harassing environments); *Boumehdi v. Plastag Holdings, LLC*, 489

14

F.3d 781, 789 (7th Cir. 2007) ("A jury reasonably could conclude [that] at least eighteen sexist or sexual comments in less than a year's time and . . . similar comments . . . made 'very often,' . . . was pervasive enough to create a hostile work environment.").

On the other hand, other cases not involving touching or involving relatively limited touching have not established an objectively hostile working environment. *See Swyear*, 911 F.3d at 881-82 (vulgar nicknames not directed toward the plaintiff, occasional discussions of a co-worker's romantic life, one instance of offensive sexual advances involving minor touching, but no threats or humiliation); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (only verbal harassment); *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993) (one occasion of touching and rubbing plaintiff's leg, one instance of kissing for several seconds, and one instance of "lurching" at her as if to grab her)); *Adusumilli v. City of Chi.*, 164 F.3d 353, 361-62 (7th Cir. 1998) ("teasing about waving at squad cars [like a prostitute might], ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks"). In these cases, courts have expected employees to be "generally mature individuals with the thick skin that comes from living in the modern world." *Swyear*, 911 F.3d at 881.

In Covington's case, the City points to three instances involving Roberts—his comments in the car outside his house, his comment suggesting the frequent crisis line caller wanted to have phone sex with Covington, and his delaying her CPR training that would have allowed her to receive a raise—and numerous instances involving Johnson—his posting her picture as the "cute new dispatcher," his frequent underwear talk, comments about sex with his wife, questions about Covington's sex life, and his display of his nipple piercings—to argue that the work environment

was not severe or pervasive enough to support a sexual harassment claim.   The City also notes that Covington's exposure to the offensive work environment stopped on December 21, 2016, when Roberts and Laughland reassigned her to be trained by other telecommunicators. Covington insists the offensive behavior was frequent, offensive, and humiliating and made it difficult for her to do her job.

Considering the totality of the circumstances, a reasonable jury could find Covington's work environment was objectively hostile and adversely affected her ability to train to be a telecommunicator.   From the moment Covington began working at the MPD, Johnson peppered her with offensive sexual comments.   While none was severe or threatening, they pervaded the work environment and humiliated Covington in front of her coworkers.   Additionally, on numerous occasions Johnson berated Covington—as he had at least one other female trainee—to the point of tears.   While none of the things he did in those instances overtly related to her sex— calling her "idiot," "retarded," and "stupid," making her cry, and refusing to train her—a reasonable jury could find they were part and parcel of Johnson's constant campaign of harassing Covington because of her sex whether by making sexual comments or by treating her differently than he treated his male coworkers.   *Alamo v. Bliss*, 864 F.3d 541, 551 (7th Cir. 2017) (finding harassment with no overt relation to national origin discrimination was party of "multifaceted effort to harass" plaintiff because of his national origin*).*   The evidence shows that campaign of harassment not only made it harder for her to train as a telecommunicator, it actually impaired her progress.

As for Roberts, his blunders were fairly innocuous.   The conversation outside his home could have been an effort to signal he was open to a sexual relationship while his wife was out of town, and Roberts's reference to "phone sex" was offensive but occurred only once.

Nevertheless, his conduct contributed, if only minimally, to the hostile work environment created primarily by Johnson.

In sum, when taken together, Johnson's and Roberts's sexual comments were pervasive enough for a reasonable jury to find they created an objectively hostile work environment, effectively changing the terms and conditions of Covington's employment. Accordingly, the City is not entitled to summary judgment on Counts I or V.

      C.     Equal Protection Discrimination Claims:   Count III

The City seeks summary judgment on Count III, Covington's § 1983 equal protection claims based on disparate treatment of her because she is a woman and because she is disabled. She brings those claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, a municipality may not be held liable for the conduct of its employees under § 1983 on a *respondeat superior* theory. *Id*. at 690. However, it may be liable under § 1983 if (1) it had an express policy calling for constitutional violations, (2) it had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law, or (3) if a person with final policymaking authority for the municipality caused the constitutional violation. *Id.* at 694. A municipality is liable only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is the moving force behind the constitutional violation. *Id.* at 694.

The Court first addresses Covington's *Monell* claims that the City had a policy or practice of supporting a hostile work environment based on sex and based on disability. The requirements for proving a hostile environment under Title VII and the Equal Protection Clause are the same. *Alamo v. Bliss*, 864 F.3d 541, 550 n. 16 (7th Cir. 2017); *see Silva v. Wisc.*, 917

F.3d 546, 559 (7th Cir. 2019) ("We evaluate discrimination claims brought under both Title VII and § 1983 using the same standard."); *see, e.g., Porter v. City of Chi.*, 700 F.3d 944, 955-56 (7th Cir. 2012).   However, as noted above, to hold the City liable for a hostile work environment, Covington must prove a basis for municipal liability under *Monell*, and there is not enough evidence from which a reasonable jury could find a municipal policy of sex or disability discrimination.   She points to Johnson's pervasive harassing conduct and Roberts's isolated instances of poor judgment, but that is not enough to establish a widespread practice in the City—or even in the MPD—that was so permanent and well settled as to constitute a custom or usage.   Instead, it was conduct primarily by a single coworker that Roberts remedied by changing Covington's trainer as soon as she informed him about the problem.

Covington further suggests Roberts's recommendation to terminate her constituted a municipal policy under the third category—a decision by a person with final policymaking authority.   However, whether a police chief is a final decisionmaker for a municipality is a matter of state law, *Venters v. City of Delphi*, 123 F.3d 956, 966 (7th Cir. 1997), and nothing here shows Roberts had such authority.   While he may have been a final policymaking authority for the *police department* on certain matters, nothing suggests he possesses that authority for the City as a whole.   In fact, that is why Mayor Stevens, not by Roberts, made the final decision to terminate Covington.   In the absence of any evidence that Roberts was a final policymaking authority for the City, a *Monell* claim based on his decision cannot succeed.[2]

---

[2] The parties have not argued, and the Court has not considered, the "cat's paw" theory under which a person without final policymaking authority is able to influence the decision of a final policymaker.   *Staub v. Proctor Hosp.,* 562 U.S. 411, 422 (2011).   The Court of Appeals for the Seventh Circuit has expressed skepticism whether the "cat's paw" theory is viable in § 1983 action where there is no *respondeat superior* liability.   *See Waters v. City of Chi.*, 580 F.3d 575, 586 n.2 (7th Cir. 2009) ("Imputing a nondecisionmaker's motive to a municipal employer sounds a lot like *respondeat superior* liability.   Given that well developed § 1983 municipal liability

For these reasons, the City is entitled to summary judgment Count III.   In light of the conclusion that Covington cannot prove a municipal policy under *Monell*, the Court need not consider the City's other arguments for summary judgment on Count III.

D.     Retaliation Claims:   Counts I, II, IV, and V

The City seeks summary judgment on Covington's retaliation claims pled in Counts I, II, IV and V based on her reporting of sex and disability discrimination.   It claims she cannot succeed under either the direct or indirect method of proving retaliation.   It notes she has no evidence of any causal connection between her complaints and her termination, which it justified by her poor performance during her training.

For her part, Covington argues that, rather than relying on the traditional direct and indirect methods of proof, the Court should consider the ultimate question—whether the evidence as a whole would permit a reasonable jury to find retaliation.   She questions the reasons offered by the City for her termination, noting the suspicious timing of the decision to terminate her only a month after her complaints, the quality of her performance compared to others who were not terminated, and the failure to follow the progressive discipline policy contained in the applicable collective bargaining agreement.

Title VII prohibits retaliation for reporting sexual harassment:   "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."   42 U.S.C. § 2000e-3(a).   The ADA also forbids

---

law recognizes delegation and ratification, there seems to be little point in trying to awkwardly fit the cat's paw concept in this area of civil rights law."); *compare Simstad v. Scheub*, 816 F.3d 893, 902 (7th Cir. 2016) (considering but not endorsing the "cat's paw" theory in the context of municipal liability).

retaliation: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

Courts used to analyze retaliation claims at the summary judgment stage using the so-called "direct" and "indirect" methods of proof. *See, e.g., Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). However, in *Ortiz v. Werner Enterprises Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016), the Court of Appeals for the Seventh Circuit encouraged courts to dispense with the direct/indirect dichotomy and concentrate on "the sole question that matters" and the evidence relevant to that inquiry *Id.* at 764. In a discrimination case like *Ortiz*, that question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. In a retaliation case like the one at bar, the key question is whether there is enough evidence for a reasonable jury to find that the plaintiff engaged in protected activity and suffered an adverse employment action because of it. *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017).

The parties rightly do not dispute the first two elements of Covington's retaliation claim—protected activity and an adverse employment action. Instead, they focus on the third element—the causal connection between the activity and the employment action. To prove the causal link, a plaintiff may rely on circumstantial evidence such as, for example, "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).

The Court believes that there is enough evidence in this case for a reasonable jury to find Covington was not fired for her poor performance and was instead fired because of the complaints she made about sexual and disability harassment. First, the evidence of her "poor performance" is anything but clear. Her evaluations are a mixed bag; some are good and some reveal problems. This is not surprising in light of the fact that Johnson was abusive to her or abjectly refused to train her for a substantial portion of her training time. Once she got back on track, she ended up with about eight weeks of good training, not the twelve weeks the City touts as going above and beyond its regular practice. There is testimony from knowledgeable witnesses that by the end of her training she was performing similarly to others at that stage of training, that she was making progress, and that they believed she had not been given a fair chance to succeed in her training.

Additionally, there is evidence that other telecommunicators, while not similarly situated in all respects, were retained after committing egregious misconduct, sometimes involving illegal activity. One has to wonder how a police department could retain a telecommunicator who drove a police car after drinking and used the police department's computers illegally, and then fire a telecommunicator trainee whose progress was impeded by a harassing trainer and who thereafter made progress.

All this must be viewed against a background of a police department in which Johnson's misconduct was known and tolerated by many, and where Covington, after her first informal complaint, was told to "[j]ust kind of deal with it" because "that's just the way [Johnson] is." Covington Dep. 229:2-6 (Doc. 44-5). The MPD tolerated this at least until Covington lodged a formal complaint, and then it fired her just a month later, apparently without ever disciplining Johnson. The Court believes that a reasonable jury could look at this body of evidence as a

whole and find that the City's decision to fire Covington was because she did not find a way to "[j]ust kind of deal with it" and instead complained about sexual and/or disability harassment.

E.     <u>Summary</u>

Summary judgment is granted in favor of the City on the *Monell* claims in Count III. Remaining for trial against the City are the sex discrimination claims in Counts I and V, the disability discrimination claims in Counts II and IV and the retaliation claims in Counts I, II, IV, and V.

**IV.    Roberts's Motion for Summary Judgment (Doc. 40)**

Roberts, sued in Counts III, IV, and V, asks for summary judgment on all those counts.[3]

A.     <u>Disability Discrimination Claim:   Count IV</u>

Roberts echoes the City's arguments that Covington cannot prove she was disabled at the relevant time.   For the same reasons the Court rejected the City's arguments, it rejects Roberts's as well.

B.     <u>Sex Discrimination Claim:   Count V</u>

Roberts asks for summary judgment on Covington's sexual harassment claim in Count V on the sole ground that Roberts's contributions to Covington's objectionable work environment were insignificant.   As noted above, the evidence is sufficient for a reasonable jury to find an actionable objectively hostile environment based on sex.   However, it is clear that Roberts's sexually harassing conduct contributed very little to that environment compared to Johnson's, and no evidence suggests Roberts was personally aware of Johnson's behavior until Covington's formal complaint in mid-December.   Nevertheless, neither party addresses the applicable

---

[3] Roberts correctly notes that the tests applied under the IHRA are the same tests as those applied in claims for federal discrimination statutes.   *See Zaderaka v. Illinois Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989).

standard for an individual supervisor's liability under the IHRA.   Consequently, Roberts has not carried his burden on summary judgment of proving he is entitled to judgment as a matter of law. Therefore, he is not entitled to summary judgment on the sexual harassment claim in Count V.

     C.    <u>Retaliation Claims:  Counts IV and V</u>

Roberts argues that Covington cannot prove he retaliated against her using the indirect method of proof because she cannot prove she was disabled and has not pointed to any similarly situated non-disabled employees who were treated differently.   Aside from the fact, as noted above, that the Court now focuses on the ultimate question rather than the so-called direct or indirect method, Roberts has not explained why Covington must actually be disabled to be a victim of retaliation for making a reasonably well-founded complaint of disability discrimination.   He has also not explained why the appropriate comparison group is non-disabled people when the relevant distinguishing factor is making a complaint, not status as a disabled person.   Roberts's argument in this regard simply do not match up with the legal theory Covington is pursuing.   They are therefore unconvincing.

Roberts also argues that Covington cannot show that her complaints caused her termination and that, but for her complaints, she would not have been terminated.   He points to evaluation forms from the weeks immediately preceding Covington's termination indicating she had trouble and/or needed improvement in some areas, and a communication by Ehlers to Laughland expressing questions whether Covington would be able to do the telecommunicator job.   These documents, he argues, show that Covington's job performance was the reason for her termination.

It is true that the documents Roberts points to show that Covington had some performance problems and that one of her main trainers thought she might not be able to do the

job in the long run.   However, the Court continues to believe that, even in light of this evidence, the other evidence discussed in connection with Covington's retaliation claims against the City could lead a reasonable jury to believe Covington's complaints, not her job performance, caused Roberts to recommend her termination.

For these reasons, the Court will deny Roberts's motion to the extent it seeks summary judgment on the retaliation claims Counts IV and V.

D.    Equal Protection Claims:   Count III

Roberts asks for summary judgment on Count III, Covington's claim of discrimination in violation of the Equal Protection Clause.[4]   To the extent this claim is based on Roberts's contribution to a hostile work environment based on sexual harassment, as noted above, he is correct that his direct contributions to the environment were minimal.   However, Covington is also correct that, although there is no *respondeat superior* liability in § 1983 action, *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 403 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 798 (2019), a supervisor may still be liable if, through his own conduct, he has violated the Constitution. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).   For this case, that would mean Roberts could be liable for a hostile work environment if he created it by his own conduct or, with discriminatory purpose, failed to take steps to stop Johnson from creating a hostile environment. *See id.* at 676-77; *Locke v. Haessig*, 788 F.3d 662, 667 (7th Cir. 2015) (supervisor can be liable

---

[4] The Court is puzzled whether Count III asserts sex and disability discrimination, or only sex discrimination.   In Count III or her Complaint, Covington alleges that the offending conduct was "motivated by gender and disability," Compl. ¶ 70 (Doc. 1), and in her response to the City's motion for summary judgment, she describes Count III as asserting a denial of equal protection "because of a disability and gender animus."   Pl.'s Resp. Summ. J. 1 (Doc. 44).   Yet in her response to Roberts's motion for summary judgment, she describes Count III as a claim for denial of equal protection "based on gender animus," Pl.'s Resp. Summ. J. 1 (Doc. 45).   In this order, the Court assumes she intends to assert both bases for her claim and trusts that the parties will clarify the claim, if necessary, in the proposed final pretrial order.

for subordinate's sexual harassment by "a conscious failure to protect the plaintiff from abusive conditions created by subordinates amounting to intentional discrimination"); *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) ("an equal protection claim against a supervisor requires a showing of intentional discrimination").

Here, the evidence simply does not show that Roberts's sexual harassment substantially contributed to the hostile work environment Covington experienced. Nor does it show that he was personally aware of the sexual harassment by Johnson such that his inaction could be considered discriminatory. On the contrary, Roberts took action to remove Covington from the hostile environment as soon as Covington complained to him. Therefore, Roberts is entitled to judgment on the claim in Count III that he violated Covington's equal protection rights by discriminating against her because of her sex.

As for an equal protection claim against Roberts for discrimination on the basis of disability, there is simply not enough evidence to show he was personally involved in any such discrimination either by his direct conduct or by purposefully tolerating Johnson's conduct with the intent to discriminate on the basis of disability. His conduct shows no connection with Covington's ADHD, and once he learned that Johnson had stopped training Covington after finding out she had ADHD, Roberts immediately arranged for another person to train her. The one exception to the change in trainers was necessitated by a scheduling issue and is not enough to support a finding of intentional discrimination by Roberts. In sum, there is simply not enough evidence from which a reasonable jury could find Roberts intentionally discriminated against Covington on the basis of a disability. Therefore, Roberts is entitled to judgment on the claim in Count III that he violated Covington's equal protection rights by discriminating against her because of a disability.

25

E.    Summary

Summary judgment is granted in favor of Roberts on Covington's sex discrimination and disability discrimination claims in Count III.   Remaining for trial against Roberts are the disability discrimination claim in Count IV, the sex discrimination claim in Count V, and the retaliation claims in Counts IV and V.

## V.    Johnson's Motion for Summary Judgment (Doc. 41)

Johnson essentially adopts his co-defendants' summary judgment motions in his request for summary judgment on Counts III, IV, and V.

As it did with the City and Roberts and for the reasons set forth above, the Court denies Johnson's motion as to Covington's disability discrimination claim in Count IV and her sex discrimination claim in Count V.

As for Covington's retaliation claims, the arguments advanced by the City and Roberts address the decision to terminate her employment.   Those arguments do not apply to Johnson because there is no evidence he was involved in the termination decision.   However, he has not advanced any other argument for summary judgment in Counts IV and V for other retaliatory acts.   Therefore, the Court cannot find he is entitled to judgment as a matter of law on those claims, which will proceed to trial.

As for Count III, in light of the fact that the Court has determined that the sexual harassment Covington experienced at the MPD was pervasive enough to be actionable and that Johnson was responsible for the vast majority of the harassing conduct, he is not entitled to judgment on the sex discrimination claim in Count III.   Furthermore, there is also sufficient evidence for a reasonable jury to find that Johnson was personally involved in intentionally discriminating against Covington on the basis of a disability when, without any rational reason,

he refused to train her after learning she had ADHD.   Thus, Johnson is not entitled to summary judgment on Count III.

**VI.**     **Conclusion**

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** the City's motion for summary judgment (Doc. 39).   The motion is **GRANTED** as to Count III and **DENIED** as to the sex discrimination claims in Counts I and V, the disability discrimination claims in Counts II and IV, and the retaliation claims in Counts I, II, IV, and V;

- **GRANTS in part** and **DENIES in part** Roberts's motion for summary judgment (Doc. 40).   The motion is **GRANTED** as to Count III and **DENIED** as to the disability discrimination claim in Count IV, the sex discrimination claims in Count V, and the retaliation claims in Counts IV and V;

- **DENIES** Johnson's motion for summary judgment (Doc. 41) in its entirety; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**DATED:   October 1, 2019**

s/ J. Phil Gilbert_____
**J. PHIL GILBERT**
**DISTRICT JUDGE**